Filed 2/2/21  P. v. Waltz CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B295624 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA074139) |
| v. | |
| DANIEL PAUL WALTZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Hizami, Judge.  Affirmed in part, reversed, and remanded with directions.

Alan E. Spears under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Noah P. Hill, Acting Supervising Deputy Attorney General, Steven E. Mercer, Deputy Attorney General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Daniel Paul Waltz was convicted after a jury trial of willfully inflicting corporal injury resulting in a traumatic condition upon his girlfriend, Tracy B.,[1] (Pen. Code, § 273.5, subd. (a)), disobeying a domestic violence restraining order (§ 166, subd. (c)(4)), and misdemeanor contempt of court for violating a protective order (§ 166, subd. (c)(1)).[2]

Waltz contends on appeal the trial court improperly admitted lay witness testimony from law enforcement officers about their personal experiences with bruises, improperly admitted as impeachment evidence Waltz's prior convictions for contempt of court and spousal battery, and improperly excluded character evidence about Tracy. He also claims the court improperly imposed a $500 domestic violence fee, and restitution fines and court fees should be stricken for lack of evidence of his ability to pay them.

As the prosecution concedes, the $500 domestic violence fee should be stricken because Waltz was not granted probation. We also conclude Waltz is entitled to a hearing on his ability to pay the court assessments and restitution fines. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.    *The Charges*

In an amended information, the Los Angeles County District Attorney charged Waltz with felony injury to a spouse,

---

[1]    To protect her privacy rights, we use the victim's first name and last initial. (See Cal. Rules of Court, rule 8.90(b)(4).)

[2]    Undesignated statutory references are to the Penal Code.

cohabitant, fiancée, boyfriend, girlfriend, or child's parent (§ 273.5, subd. (a), count 1); felony violation of a domestic violence court order with a prior conviction (§§ 166, subd. (c)(4), 667.5, subd. (b), count 2); and misdemeanor contempt of court for violation of a protective order and stay away order (§ 166, subd. (c)(1), count 3).

Waltz pleaded not guilty to each count and denied all special allegations.

The case proceeded to a jury trial in November 2018.

B.  *The Prosecution's Case*

Tracy and Waltz dated on and off for about 10 years and have two children together. Tracy had restraining orders issued against Waltz in 2014, 2016, and 2018 based on his violent behavior toward her. Tracy and investigating law enforcement officers from the Los Angeles County Sheriff's Department testified in the People's case-in-chief concerning several incidents of domestic violence involving her and Waltz.

1.  *Prior domestic violence incidents involving Tracy and Waltz*

a. *The September 2013 incident*

In September 2013, the police were called to Tracy's apartment. She and Waltz had been drinking alcohol and got into a loud argument that involved "a lot of yelling and screaming." Waltz grabbed Tracy by her upper arms and was "shaking [her] against the kitchen counter."

3

When Detective Patrick Reader responded to the call to Tracy's apartment, Waltz told Tracy not to open the door.[3] She was afraid Waltz would hurt her even more. Therefore, Tracy told Reader she and Waltz only had a verbal argument, and Waltz had not physically touched her.

The next day, Tracy went to the sheriff's station to report Waltz's actions. She told Reader what had actually happened and stated she was afraid of Waltz and wanted him out of her house. When Reader took Tracy's report, he observed bruises on her arms. He had also observed the day before that Tracy was intoxicated.

### b. *The December 2014 incident*

In December 2014, a restraining order had been issued against Waltz with Tracy as the protected individual. When Tracy arrived home one day in December 2014, Waltz was there. He chased Tracy upstairs toward her front door; Tracy could not close the door fast enough, and Waltz "slammed" her into the wall next to the front door, causing a bruise on her side. Tracy fell to the floor and Waltz began hitting her until a passerby came up the stairs, grabbed Waltz, and pulled him out of Tracy's apartment, allowing Tracy to escape inside the apartment and lock the door.

Deputy Joshua Myatt responded to Tracy's apartment and observed Tracy had a half inch red mark under her right eye. Waltz was outside the apartment complex and appeared upset and angry. Myatt did not see that Waltz had any injuries.

---

[3]     All law enforcement deputies involved in the relevant incidents were from the Los Angeles County Sheriff's Department.

### c.  The September 2016 incident

In September 2016, Tracy had a restraining order against Waltz, but she allowed him to spend the night with her.  Tracy and Waltz drank alcohol and had sexual intercourse, during which Waltz punched Tracy in the face and head, called her names, told her she disgusted him, and accused her of cheating on him.

Tracy called the police, and Deputy James Chow responded.  He observed that Tracy was intoxicated and had redness and swelling on the right side of her face.  Chow found Waltz in bed under a blanket.  When Chow lifted the blanket, Waltz said, "I did not touch her."  Tracy obtained a new restraining order against Waltz on December 14, 2016.

### d.  The March 2018 incident

In March 2018, although Tracy had a restraining order against Waltz, she allowed him to spend the night with her and agreed to give him a haircut.  Waltz grew angry about how Tracy was cutting his hair and became "very loud and aggressive," screaming at her that she was doing it wrong.  He pinned Tracy against a counter while squeezing her face and "screaming nose to nose."  Tracy called the police, and Deputy Cody Larocco arrived.  Waltz waived his Miranda rights and acknowledged he knew that Tracy had a restraining order against him.  Tracy obtained another restraining order against Waltz on March 29, 2018.

### 2.  *Tracy's April 2016 fight with a different romantic partner*

In April 2016, Tracy fought and argued with Adrian Adler, whom she had briefly dated after breaking up with Waltz.  After

Tracy and Adler had split up, Adler chased Tracy when she was walking home past his house and grabbed her arm. Tracy screamed "rape" a few times to scare Adler into letting her go. She swung her purse at Adler and hit his car, and she may have ripped his shirt. The police arrived and arrested Tracy.[4]

### 3. *The June 2018 incident upon which the charges against Waltz were based*

On June 24, 2018, Waltz arrived at Tracy's apartment around 10:00 a.m. and pounded on her door. Tracy had a restraining order against Waltz at the time. She had not invited Waltz to come over to her apartment. Tracy had used methamphetamine the day before and could not remember whether she had also drunk alcohol that day.

When Tracy opened the door, Waltz was yelling and screaming at her about a cell phone he thought she had, and he seemed to be "a little out of control." He refused to leave when Tracy asked him to do so. Waltz shoved Tracy to the floor after she called him a name. Her arm hit a doorknob when she fell. Waltz then kicked and stomped on her legs, arms, and hands. Tracy tried to kick Waltz once or twice to defend herself, as he continued to yell and kick her.

Waltz then grabbed Tracy by her arms, pulled her down the hallway, and "propped" her up with pillows in a cubbyhole in the hallway. Waltz said, "Why did you make me do that? I'm not going back to jail." Tracy was crying, and she was "terrified."

---

[4] After Waltz had testified, and before the defense rested, the jury was informed that the prosecutor and defense counsel stipulated that, as a result of the April 2016 incident, Tracy was convicted of misdemeanor domestic violence battery against Adler.

6

She asked Waltz to let her call an ambulance because she thought her legs could be broken. Waltz paced back and forth with a bandana in his hand and mumbled incoherently. Waltz left to take a shower, but then returned, knelt next to Tracy and said, "Sorry, but I have to do this. I'm not going back to jail." He then placed the bandana around Tracy's neck and started pulling on it, squeezing the front of Tracy's neck. Tracy tried to yell, but she was not able to breathe and felt her voice was hoarse. Waltz then stopped pulling on the bandana and told Tracy to stay where she was. Tracy took Waltz's backpack and dumped the items in it onto the floor to find the cell phone he had been screaming about, but Waltz said the phone in his backpack wasn't the right one. After Waltz repacked the backpack, Tracy threw it out the front door and tried to shut the door after Waltz went to retrieve the backpack. When Waltz returned to the apartment, Tracy managed to get out of the apartment while Waltz remained inside.

Eventually, Waltz left the apartment, and Tracy returned to it, cried for a while, then found her cellphone and called 911. In 911 calls that were played for the jury, Tracy described what had happened and stated that she had a restraining order against Waltz.

Police officers responded to Tracy's apartment and found her leaning against the door to hold herself up. Deputy Thomas Maxwell, one of the responding officers, testified Tracy's voice was very hoarse and she had difficulty speaking; and she did not appear intoxicated. Maxwell did not notice visible injuries to Tracy's neck or body although she complained of pain. The officers interviewed Tracy and photographed her neck, arms, and

7

legs.  The photographs taken at that time showed Tracy had sustained bruises on her arms and legs.

The officers called an ambulance, and Tracy was taken to a hospital.  Photographs taken at the hospital showed marks on her neck and marks and bruises on her arms and legs.

After Tracy returned to her apartment from the hospital around midnight, Waltz came back to the apartment and pounded on the door while yelling her name.  He sounded angry, so Tracy called 911 without answering the door.

Deputy Travis Fridenstine responded and found Waltz outside the apartment banging on Tracy's door and yelling for her to let him in.  Fridenstine observed and photographed bruising in three areas on Tracy's left arm, but he did not notice any marks on Tracy's neck.  Fridenstine testified Tracy did not show signs of alcohol or methamphetamine impairment.  He also took a photograph of a bandana under the apartment's balcony.

Waltz was detained, and he waived his *Miranda* rights.  Waltz acknowledged that Tracy had a restraining order against him and admitted he had argued with her at the apartment earlier that evening, but he denied he had assaulted Tracy.  Waltz had no visible injuries and did not claim that Tracy had assaulted or hit him.

C.    *The Defense Case*

Waltz testified that Tracy began drinking heavily a few years into their relationship.  He described her behavior when drinking as "angry," "controlling," "loose, immoral, violent, [and] overbearing."  Waltz expressed anger towards Tracy "a few times," "by yelling."

Waltz acknowledged that he violated orders to stay away from Tracy "a couple times," but "not like the way [the prosecutor

8

was] saying it." Waltz stated he violated the orders because he wanted to see Tracy and "wanted to make sure that she was okay." Tracy would also call him, and Waltz would come over, although he knew a court order was in place.

Waltz acknowledged five prior convictions for (1) misdemeanor spousal battery (§ 243, subd. (e)(1)) on December 23, 2014; (2) felony contempt of court (§ 166, subd. (a)(4)) on December 23, 2014; (3) misdemeanor contempt of court for violation of a domestic violence protective order (§ 166, subd. (c)(1)) on July 14, 2015; (4) misdemeanor contempt of court for violation of a domestic violence protective order (§ 166, subd. (c)(1)) on August 16, 2016; and (5) felony violation of a domestic violence protective order (§ 166, subd. (c)(4)) on December 14, 2016. Waltz testified that in each of the instances he was convicted of contempt for violation of a protective order Tracy had invited him to come to see her. Waltz acknowledged that he got angry when men called Tracy because he assumed she was cheating on him.

Waltz denied grabbing Tracy by the forearms in 2013 and causing her to experience pain and to sustain bruises.

Waltz testified that in August 2014, Tracy invited him to her home, but when he arrived, she asked him to leave and called the police. According to Waltz, Tracy wanted to "get drugs." He did not want to leave because he felt Tracy was "not acting right," and "something was amiss." Waltz explained that he got upset with Tracy but in a "concerned manner," not a "mean manner."

Waltz denied pushing Tracy into a wall in December 2014. According to him, Tracy opened the door and was "out of control" when a neighbor walked in and pulled Waltz out of the house.

Waltz testified that with respect to the incident in August 2016, Tracy had been drinking heavily and "acting odd" when they argued. Tracy was "up to her old ways," which Waltz described as "doing drugs, having men call her all the time on her phone, not acting trustworthy." Waltz denied hitting Tracy or having any physical contact with her that day.

Waltz denied that he hit Tracy while they were having sex in September 2016 and that he hid under a blanket afterwards. Waltz claimed he was either sleeping or in the bathroom when the police arrived, and he was not trying to conceal himself.

Waltz testified he was the victim in the June 2018 incident, and he was not violent toward Tracy in any way. Tracy called him and asked him to "keep her company" and to protect her in case a man named "Peshi," who was staying with Tracy at the time, became violent. Waltz arrived at Tracy's apartment after midnight, and he knew he was violating a restraining order. Waltz was heartbroken "about what [Tracy] had been doing." Tracy was alone, and Waltz knew she had been drinking because she was "violent" and "moody." Waltz did not see Tracy use drugs or drink alcohol that day, although she showed him a drug pipe made from a light bulb that had residue in it.

Waltz testified Tracy "could not handle the guilt" related to his heartbreak over her behavior, so she "attacked" him and got "progressively more mean, more worse about it." Waltz claimed Tracy kicked him, lost her balance when he blocked her kick with his leg, fell into the closet doorjamb, and "blacked out." When she regained consciousness, Tracy's eyes would not focus, and she said, "You broke my leg." Waltz testified he did not stomp on Tracy's leg, and Tracy was hallucinating. He felt "pretty sure that I had consoled her, made her content."

10

Waltz picked up Tracy, pulled her to a bedroom door to "sit and just be comfortable," and brought her cushions and a cold drink. At that point, Tracy stated she was going to call the police, and Waltz replied, "You shouldn't do that because you attacked me. I didn't attack you."

While Waltz was taking a shower, Tracy dumped his belongings on the floor and told him she had called the police. Waltz left the apartment because Tracy was "running around the apartment trying to keep me from getting my things," and she was "erratic" and "violent." He "wanted to get away from her as soon as possible" and felt leaving "would be the best thing due to her behavior."

Waltz denied choking Tracy with a bandana or stomping on her legs. Although Tracy was hitting and kicking him, Waltz testified he never fought back or forcibly touched her in any way.

Waltz subsequently returned to Tracy's apartment to retrieve his cell phone and a Star Wars movie. Tracy did not respond to his loud knocking and ringing of the doorbell, so he left and then returned a third time before 2:00 a.m.

D.    *The Jury Verdict and Sentencing*

In a bifurcated proceeding out of the jury's presence on November 20, 2018, Waltz admitted to: (1) a prior misdemeanor conviction for willfully violating a court order (§ 166, subd. (a)(1)); (2) a prior felony conviction for violating a court order within seven years of a previous violation that involved violence or a "credible threat" of violence (§ 166, subd. (c)(4)); and (3) a prior prison term within the meaning of section 667.5.

On November 21, 2018, the jury found Waltz guilty on all three counts.

11

On December 20, 2018, the trial court denied probation and sentenced Waltz to five years, eight months in state prison, consisting of the upper term of four years on count 1 (§ 273.5, subd. (a)) plus a one-year enhancement for a prior prison term (§ 667.5, subd. (b)), eight months on count 2 (§ 166, subd. (c)(4)) to run consecutively with count 1, and 364 days on count 3 (§166, subd. (c)(1)) to run concurrently with count 1, with 360 days of custody and conduct credits.

The trial court imposed a $1,500 restitution fine (§ 1202.4, subd. (b)); a $120 court operations assessment (§ 1465.8, subd. (a)(1)), a $90 criminal conviction assessment (Gov. Code, § 70373, subd. (A)), a $1,500 parole revocation fine that it stayed. The trial court also imposed a $500 domestic violence fund fee pursuant to section 1203.097, subdivision (a)(5). Waltz was served with a new 10-year domestic violence criminal protective order barring him from any contact with Tracy.

Waltz timely appealed the judgment.

## DISCUSSION

### A. *Standard of Review*

"A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130-131; accord *People v. Cowan* (2010) 50 Cal.4th 401, 462.) "A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation]." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65; accord *People v. Lewis* (2009) 46 Cal.4th 1255, 1286 ["A reviewing

court will disturb the trial court's determination on the admissibility of evidence only if it "'"exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]"'".)

We review questions of law and constitutional claims on undisputed facts de novo. (*People v. Frazier* (2020) 55 Cal.App.5th 858.)

> B. *Any Error in the Admission of Lay Testimony from Reader and Chow Was Harmless*

Waltz contends the trial court erred in admitting, over his counsel's objection, testimony from Reader and Chow concerning their personal experiences with bruises. We conclude the admission of this testimony was improper but that any error was harmless.

> 1. *Reader's and Chow's testimony regarding their experience with bruises*

After Reader testified about the 2013 incident, the prosecutor asked him the following series of questions over defense counsel's repeated objections on relevance and foundation grounds (omitted here):

"Q: Okay. Now, detective, have you ever in your life gotten a bruise before?

A: Yes.

Q: Now, when you've gotten bruises before, are they visible bruises?

A: Yes.

Q: Okay. And do they always occur immediately after you injure yourself?

A: Can you restate the question?

13

Q: Sure. Let's say you were walking down the street and walked into a doorway, just didn't see it. Would you always get a bruise immediately after walking into that doorway?

The Court: Did the bruise appear immediately?

The Witness: No.

[Prosecutor]: Approximately–just for you personally, how long did it usually take for an actual visible bruise to appear after hitting a portion of your body?

The Court: . . . For you how long did that take?

The Witness: For myself, one to two hours.

[Prosecutor]: Okay. And is that consistent every single time you hurt yourself?

The Witness: No."

After Chow testified about the 2016 incident, the prosecutor asked him similar questions about his personal experience with bruises, again over defense counsel's repeated objections:

"Q: Now, deputy Chow, have you ever knocked your knee into a table and gotten a bruise?

The Witness: Yes.

Q: And approximately how many times your lifetime have you gotten a bruise?

A: A lot.

Q: Okay. Would you say that the–would you get a bruise immediately after hitting your body on something hard?

A: No.

Q: Approximately how long would it average take [sic] for a bruise to form after you hit yourself?

The Court: And this is just on your body that we're talking about; right?

14

The Witness: Yes, sir.

The Court: "Okay, go ahead. You can answer. Over the defendant's objection, I'll allow it.

The Witness: I would say about an hour.

[Prosecutor]: And is it the same every time?

Witness: Approximately."

After the prosecution rested, defense counsel stated outside the jury's presence: "My objection was it's not relevant because, first off, there was no indication that she had bruising on her knees, and they testified that–all her questions regarded bruising on her knees. They're not, obviously medical doctors. They don't have the knowledge or expertise to assist the jury in something that's beyond their scope of expertise themselves. In other words, they don't know more than the jurors would know about bruising, so it doesn't assist the jurors in any fact in issue in this case. I would object to relevance and ask the court to strike the testimony concerning bruising."

The trial court reiterated that it overruled the objection, explaining: "I did believe that the evidence is not outside the scope of a lay witness, that when they get—walk into a table or something like that, sometimes the bruise does not automatically immediately manifest itself. Sometimes it takes some time, maybe an hour, maybe a day, depending on the nature of the injury. It's common for people to have that, and I overruled your objection based on that ground."

In closing arguments, the prosecutor stated in relevant part: "So Deputy Maxwell testified they did not see any injuries when he first showed up, okay. But we also talked about the fact, again, that everybody's different, that two different deputies came up here and told you that they bruise differently within

15

themselves.  Sometimes it takes an hour, sometimes two hours, but never the same."

In his closing statement, defense counsel stated, in turn: "While we're on the subject of medical diagnoses, let's talk about the deputies' testimony concerning the bruising.  If that's the—hopefully you're not going to hang your hat on that for any sort of conviction because that was ridiculous testimony.  Who cares that they had bruises on their knees?  Who cares?  We all are different people, yes, but they are not medically trained to give you an opinion as to how bruising can occur, how fast it can occur, and where it can occur and how it occurs.  They can't do that.  They have no more medical expertise than anybody else does."

In rebuttal, the prosecutor argued:  "And the deputies that testified to the bruising, no, they're not experts in bruising.  The point that I was making with the deputies testifying to the bruising is the snowflake.  Right?  We're all different.  We all bruise differently.  It takes a different time.  And I don't think any of you actually need expert testimony in how—where a bruise comes from.  Okay?  We walk into doors.  We walk into tables.  We get hit, stomped on, and bruises form.  Pretty self-explanatory.  So, no, they don't need to be experts."

2.    *Legal Principles*

Under Evidence Code section 800, "[i]f a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."  "Matters that go beyond common experience and require particular scientific knowledge

16

may not properly be the subject of lay opinion testimony." (*People v. DeHoyos, supra*, 57 Cal.4th at p. 131.) ""Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.'"" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)

"'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."' (*People v. Scott* (2011) 52 Cal.4th 452, 490, quoting Evid. Code, § 210.) 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Hardy* (2018) 5 Cal.5th 56, 87, quoting Evid. Code, § 352.)

Reader's and Chow's testimony regarding their personal experience with bruises is certainly rationally based on their own perception, and "lay witnesses are generally competent to testify as to their own knowledge of their diseases, injuries, or physical condition. [Citation]." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 528). Such testimony is also arguably relevant to prove that Tracy could have suffered injuries, even if they were not visible as bruises when Maxwell observed her.

However, Reader's and Chow's personal experience regarding bruising was not helpful to a clear understanding of the testimony they gave, which exclusively pertained to the incidents they responded to in September 2013 (Reader) and

17

September 2016 (Chow).  Rather, the prosecutor elicited testimony concerning bruises they experienced for the sole reason of supporting the proposition that injuries to Tracy may not yet have been evident to Maxwell when he responded to the scene of the June 2018 incident—for which neither Reader nor Chow was present and to which neither of them specifically testified—and to bolster Fridenstine's observation of Tracy's bruises six or so hours later.  Neither Reader nor Chow observed Tracy after the 2018 incident or connected their own experience of bruising to any opinion on the appearance of bruises on Tracy as it related to her claimed injuries in June 2018.  The deputies' personal experiences with bruising were far too attenuated to be relevant to any issue at the trial.  Thus, by admitting such testimony from Reader and Chow, the court abused its discretion because the testimony was not helpful to the jury's clear understanding of their own testimony.  (See *People v. Miron* (1989) 210 Cal.App.3d 580, 583 ["a lay witness's opinion is not generally admissible unless it is rationally based on the witness's perception *and* helpful to a clear understanding of his or her testimony"].)

Although the court erred in admitting Reader's and Chow's testimony in this regard, such error was harmless because it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  The evidence of Waltz's guilt was strong, and there was little likelihood that Reader's and Chow's testimony regarding their personal experiences with bruises affected the jury's decision.

As Waltz concedes, photographs of Tracy at the hospital—taken soon after Maxwell had observed her—depicted marks on her neck and bruising on her arms and legs, and Fridenstine

18

observed bruises on Tracy's arm after she had returned from the hospital.  Waltz also had a long, well-documented history of being violent with Tracy, even when restraining orders had been issued based on his prior behavior.  It is not reasonably probable the jury would have reached a different result if Reader's and Chow's testimony concerning their personal experiences with bruises had been excluded.[5]

C.   *Admission of Waltz's Past Convictions of Spousal Battery and Felony Contempt of Court for Impeachment Purposes*

Waltz contends the trial court erred in admitting his past misdemeanor spousal battery and felony contempt of court convictions as impeachment evidence because the crimes did not involve "moral turpitude."[6]  A witness may be impeached with

---

[5]   The People note that Waltz did not invoke Evidence Code section 352 at the trial and object to the admission of Reader's and Chow's testimony concerning bruising because the probative value of such testimony was outweighed by the probability that its admission would create substantial danger of undue prejudice.  As we have found the court erred in admitting the testimony because it was not relevant, we need not address the People's contention that Waltz's failure to object to such testimony at trial on Evidence Code section 352 grounds amounted to a forfeiture.

[6]   Over defense counsel's objection, the trial court ruled Waltz could be impeached with several of his prior convictions, including one for felony contempt of court (§ 166, subd. (c)(4)), three for misdemeanor contempts of court (§ 166, subds. (a)(4) & (c)(1)), and one for misdemeanor spousal battery (§ 243, subd. (e)(1)).  In so doing, the trial court stated that, because the contempt of court convictions involved violations of underlying

prior convictions involving "moral turpitude," subject to the trial court's exercise of discretion under Evidence Code section 352 to exclude evidence of prior convictions, if the prejudicial impact of the evidence does not outweigh its probative value. (*People v. Clark* (2011) 52 Cal.4th 856, 931-933 (*Clark*); *People v. Castro* (1985) 38 Cal.3d 301, 306 (*Castro*).) "Moral turpitude" is defined as a "'general readiness to do evil,'" from which a readiness to lie can be inferred. (*Castro, supra*, 38 Cal. 3d at p. 315.) In determining whether a crime involves "moral turpitude," the trial court looks to the statutory definition of the particular crime to determine whether "the least adjudicated elements of the conviction necessarily involve moral turpitude," that is, whether the elements of the crime, without reference to the specific circumstances of the conviction at issue "necessarily evince any character trait which can reasonably be characterized as 'immoral.'" (*Id.* at p. 317, fn. 13.)

In exercising its discretion under Evidence Code section 352 when determining whether to admit a prior conviction for impeachment purposes, the trial court should consider "'(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions. [Citation].'" (*People v. Green* (1995) 34 Cal.App.4th 165, 182, quoting *People v. Muldrow* (1988) 202 Cal.App.3d 636, 644; *Clark, supra,* 52 Cal.4th at pp. 931-932.) The trial court's

---

domestic violence protective orders, it believed that was sufficient to constitute a crime of moral turpitude.

discretion to admit or exclude impeachment evidence is broad, and a reviewing court ordinarily will uphold the trial court's exercise of that discretion.  (*People v. Collins* (1986) 42 Cal.3d 378, 389.)  The "systematic occurrence" of similar priors over a period of time may "create a pattern that is relevant to [the witnesses's] credibility.  (*Muldrow*, at p. 648.)

### 1. *Misdemeanor spousal battery is a crime involving moral turpitude*

Waltz cites no case law on point concerning whether the specific misdemeanor spousal battery conviction at issue constitutes moral turpitude.  However, as the People note, courts have held that domestic violence convictions pursuant to section 273.5 necessarily involve moral turpitude and are thus admissible for impeachment purposes because of the special relationship between the perpetrator and the victim.  (*People v. Burton* (2015) 243 Cal.App.4th 129, 136; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 (*Rodriguez*); see also *Donley v. Davi* (2009) 180 Cal.App.4th 447, 461 [a misdemeanor violation of "section 273.5 is a crime of moral turpitude as a matter of law"].)

The *Rodriguez* court explained: "To violate Penal Code section 273.5 the assailant must, at the very least, have set out, successfully, to injure a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable.  To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it willfully and with intent to injure, necessarily connotes the general readiness

21

to do evil that has been held to define moral turpitude."[7] (*Rodriguez, supra,* 5 Cal.App.4th at p. 1402.)

Although *Rodriguez* specifically declined to analogize section 273.5 to any of the battery statutes (*Rodriguez, supra,* 5 Cal.App.4th at p. 1402), the Court of Appeal's holding in that case applies with equal force to the crime of spousal battery. Spousal battery under section 243, subdivision (e)(1), identifies a specific victim defined by a special relationship to the perpetrator—"a spouse, a person with whom the defendant is cohabiting, a person who is the parent of the defendant's child, former spouse, fiancé or fiancée, or a person with whom the defendant currently has, or has previously had, a dating or engagement relationship."[8] As such, the crime of misdemeanor spousal battery adds to the crime of simple battery the requirement it be committed against a victim who has a kind of

---

[7]     The version of section 273.5 examined in *Rodriguez* provided that "'(a) Any person who willfully inflicts upon his or her spouse, or any person who willfully inflicts upon any person of the opposite sex with whom he or she is cohabiting, or any person who willfully inflicts upon any person who is the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony. . . .'" (*Rodriguez, supra,* 5 Cal.App.4th at p. 1401.)

[8]     Courts have held that certain other battery convictions do reflect moral turpitude as well. (See, e.g., *People v. Chavez* (2000) 84 Cal.App.4th 25, 30 [holding that misdemeanor sexual battery under § 243.4, subd. (d), is a crime of moral turpitude because "the degrading use of another, against her will, for one's own sexual arousal is deserving of moral condemnation"]; *People v. Lindsay* (1989) 209 Cal.App.3d 849, 858 [battery on a police officer under § 243, subd. (c), involves moral turpitude].)

special relationship with the perpetrator that makes the victim especially vulnerable, and that evinces a readiness to do evil so as to constitute a crime of moral turpitude.

The trial court had broad latitude under Evidence Code section 352 to admit prior conviction evidence. (*Clark, supra,* 52 Cal.4th at pp. 931-932; *People v. Wheeler* (1992) 4 Cal.4th 284, 296, superseded by statute on other grounds as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460.) In this case, Waltz's convictions in 2014 through 2018 that were admitted into evidence were not remote; there is no indication their admission affected his decision to testify; and the past conduct was not more inflammatory than the underlying charges. That the prior convictions and charged offenses involved similar conduct was not a dispositive reason to exclude the conduct. (*Clark, supra,* 52 Cal.4th at p. 932.)

Accordingly, we conclude that under the circumstances of this case, in admitting the spousal battery conviction for impeachment purposes, the trial court properly exercised its discretion and did not act in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Lewis, supra*, 46 Cal.4th at p. 1286.)[9]

---

[9]  Moreover, Waltz concedes the spousal battery conviction was also admitted under Evidence Code section 1109 as proof of Waltz's propensity to commit that offense. In fact, Tracy testified about a domestic violence incident in December 2014, which presumably led to the spousal battery conviction, and incidents in September 2016 and March 2018 that led to convictions for violating protective orders. Also, limited time was taken to admit evidence of the convictions; at the time the convictions were admitted, no underlying facts of the crimes were elicited, just the

## 2. *Admission of the felony contempt of court conviction was harmless error*

Section 166, subdivision (c)(1), provides, in relevant part, "a willful and knowing violation of a protective order or stay-away court order . . . shall constitute contempt of court." (§ 166, subd. (c)(1).) Unlike a conviction for misdemeanor spousal battery under section 243, subdivision (e)(1), we cannot say, as a matter of law, violation of a domestic violence protective order is a crime of moral turpitude because, under *Castro's* "least adjudicated elements" test, a perpetrator can violate a protective order by simply coming into friendly contact with the protected individual, and that would not "evince any character trait which can reasonably be characterized as 'immoral.'" (*Castro, supra*, 38 Cal.3d at p. 317.)

However, even if we were to assume the court erred in admitting evidence of Waltz's prior conviction for felony contempt of court, we conclude the error was harmless. (*Watson, supra*, 46 Cal.2d at p. 836.) As explained above, there was ample evidence of Waltz's guilt regarding the June 2018 incident, including the deputies' observations of bruisings on Tracy's body and the photographs of marks on her neck, arm, and leg that were taken the night of the incident. Additionally, the jury heard testimony that Waltz had come to Tracy's apartment and contacted her

_____

fact the crimes took place; the court gave proper jury instructions concerning the limited purpose for which the convictions were admitted; and we must presume the jury followed the court's limiting instructions (*People v. Ervine* (2009) 47 Cal.4th 745, 776). Therefore, it would not be reasonably probable the admission of evidence of the spousal battery conviction affected the trial's outcome.

24

even though Tracy had obtained restraining orders preventing him from doing so. Therefore, it is not reasonably probable the jury would have reached a different verdict if evidence of Waltz's prior convictions concerning violations of protective orders had been excluded.

D. *The Trial Court Did Not Abuse Its Discretion By Excluding Evidence of Tracy's Behavior While Drinking*

After Tracy had testified, defense counsel specifically sought to have Waltz's father testify that he had seen Tracy become violent with Waltz and act "out of control" in other ways while intoxicated, including dangerously "squeezing" a dog and jumping from a moving car. The prosecutor objected that the incidents were prejudicial and not relevant. The trial court noted the declaration describing Waltz's father's testimony had been provided to the prosecution one court day before, and the proposed testimony amounted more to character evidence rather than impeachment. The court acknowledged that such character evidence might be relevant to a claim of self-defense, but that "so far, I have not heard evidence to support that claim." Ultimately, the trial court sustained the prosecutor's objection and request to preclude the testimony.

Waltz contends the trial court abused its discretion by excluding the testimony Waltz's father was prepared to give concerning Tracy. He claims the testimony should have been admitted for impeachment purposes and to prove Tracy had a propensity for violence.

We conclude the trial court did not abuse its discretion in excluding the testimony. Evidence Code section 1103 authorizes a defendant in a criminal case to offer evidence regarding a

victim's character: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).)

If a defendant claims self-defense, evidence of the victim's violent character is admissible under Evidence Code section 1103 to show the victim was the aggressor. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) However, a trial court has broad discretion to exclude such evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828.)

The trial court acted within its broad discretion in declining to admit the testimony from Waltz's father. The proffered testimony that Tracy previously was "out of control" when intoxicated had little, if any, relevance to show (1) that Tracy actually has a trait or reputation for violence; (2) that she acted in conformity with that trait or reputation on June 24, 2018; or (3) that she was the initial aggressor in the incident for which Waltz was charged. In fact, no evidence was presented that Tracy had consumed alcohol on the day of the charged incident, and Waltz himself testified he did not see Tracy drink that day, he just presumed she did based on her mood.

Even if the defense could prove Tracy's propensity to be violent when intoxicated, such evidence could not justify Waltz's conduct under his own version of the facts. Waltz admitted he repeatedly violated court orders by showing up at Tracy's apartment, including on three separate occasions on June 24, 2018. Nor did Waltz claim his conduct with Tracy was driven out of fear that she would harm him. In other words, there was no self-defense theory of injury or reasonable fear of harm. "For self-defense, the defendant must actually and reasonably believe in the need to defend, the belief must be objectively reasonable, and the fear must be of imminent danger to life or great bodily injury. [Citation]." (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1427.) Rather, Waltz testified Tracy hit and kicked him, but he never fought back or forcibly touched her at all.

Also, even if Waltz's testimony that he blocked Tracy's kick with his leg before she fell could be construed as self-defense, any probative value of the evidence Waltz offered of Tracy's propensity for violence when she was intoxicated was substantially outweighed by the potential of undue prejudice and consumption of time, misleading the jury, or confusion of the issues. The parties agreed that introducing the character evidence would require a continuance so that the prosecution could interview Waltz's father and investigate potential character evidence pertaining to the defense witnesses. Given these circumstances, the trial court's decision to exclude the proffered testimony of Waltz's father was not "arbitrary, capricious, or patently absurd." (*People v. Lewis, supra,* 46 Cal.4th at p. 1286; see *People v. Jones* (2003) 30 Cal.4th 1084, 1108-1109 [proper to exclude evidence that was "not particularly probative" and

"would have required evidence of the details of an otherwise unrelated crime"].)

Moreover, any error in excluding Waltz's father's testimony about Tracy's behavior while drinking was harmless. Evidence of Tracy's drinking and her behavior was elicited from Tracy when she testified about the incident with Adler, for which she was convicted of misdemeanor assault. In his direct and cross examination, Waltz also extensively testified about Tracy's erratic conduct while drinking alcohol during several incidents; and defense counsel in his closing argument stressed Tracy's behavior when she was intoxicated. The jury, accordingly, had other sources of evidence supporting the defense argument regarding Tracy's propensity for violent behavior while drinking, and it is not reasonably probable that additional testimony along those lines would have led them to reach a different result in light of the significant evidence of Waltz's guilt.

E. *Waltz Does Not Meet His Burden of Demonstrating His Counsel Rendered Ineffective Assistance*

We also reject Waltz's related argument that defense counsel rendered ineffective assistance because he did not, after Waltz had testified, renew the request for Waltz's father to testify. "'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of

28

professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland,* at p. 687 [ ]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [ ].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [ ].) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.'" (*People v. Gray* (2005) 37 Cal.4th 168, 206–207, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

We are not aware of the reason why counsel did not revive his request that the court allow Waltz's father to testify concerning his observations of Tracy's conduct when she was intoxicated. It is plausible counsel concluded a renewal of the request would be futile, based on the court's earlier denial. Additionally, counsel may have determined there already was sufficient evidence of Tracy's character through testimony elicited from Tracy concerning the incident involving Adler and from Waltz himself when he gave his version of Tracy's behavior during the incidents at issue. Therefore, defense counsel may have perceived there was no possibility the trial court would exercise its discretion and apply Evidence Code section 352 in such a manner to find the additional evidence was necessary and not cumulative.[10] Also, as discussed above, the defense did not

___

[10] During argument regarding motions in limine, when the issue of possibly eliciting testimony from Tracy concerning her

29

establish Waltz's acts resulted from a reasonable belief of self-defense so that evidence of Tracy's conduct when she was intoxicated was relevant to such a defense.

Waltz does not present "affirmative evidence that counsel could have had 'no rational tactical purpose' for these decisions." (*People v. Mickel* (2016) 2 Cal.5th 181, 200.) "Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Id.* at p. 198) As a consequence, Waltz's ineffective assistance of counsel claim is more appropriately decided in a habeas corpus proceeding. (See *People v. Gray, supra,* 37 Cal.4th at p. 207 [ineffective assistance of counsel claim rejected because it "is more appropriately raised in a petition for a writ of habeas corpus"]; *People v. Jones* (2003) 29 Cal.4th 1229, 1263 [issues requiring review of matters outside the record are better raised on habeus corpus rather than on direct appeal]; *People v. Mendoza Tello*, *supra,* 15 Cal.4th at pp. 266-267 [ineffective assistance of counsel claim "is more appropriately decided in a habeus corpus proceeding"].)

Even if Waltz could establish his trial counsel's performance was deficient, Waltz is unable to satisfy the second prong of the test for ineffective assistance of counsel—that he suffered prejudice to a reasonable probability. (*People v. Johnson*

---

alcohol and drug use was raised, the prosecutor indicated such testimony could open the door to Tracy having to explain she drank alcohol to deal with the stress of Waltz's "continuing course of violence." Therefore, defense counsel may have tactically decided not to resurrect his request to have Waltz's father testify out of concern about rebuttal testimony of this nature possibly being elicited from Tracy.

(2016) 62 Cal.4th 600, 653.) When the claim of ineffective assistance of counsel is based on defense counsel's failure to make a motion, as is the case in the instant matter, defendant must demonstrate the motion would have been meritorious, and it is reasonably probable that absent the omission a determination more favorable to him would have resulted. (*People v. Mattson* (1990 50 Cal.3d 826, 876-877; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438.) As discussed above, there was ample testimony concerning Tracy's behavior when she was intoxicated, thus Waltz cannot satisfy his burden of demonstrating prejudice by his counsel's failure to renew a request that Waltz's father be permitted to testify.

F. *The $500 Domestic Violence Fee Under Section 1203.097 Is Inapplicable Because the Trial Court Did Not Grant Probation*

Waltz contends—and the People concede—the trial court erred in imposing a $500 domestic violence fund fee under section 1203.097 because that section only applies when a defendant is granted probation. We agree. Section 1203.097 provides that "(a) *If a person is granted probation* for a crime in which the victim is a person defined in Section 6211 of the Family Code, the terms *of probation* shall include . . . (5)(A) A minimum payment by the defendant of a fee of five hundred ($500) . . . ." (§ 1203.097, subd. (a)(5)(A) (emphasis added).) By its plain language, this section only applies when the trial court grants probation. (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1520.) Because the trial court did not grant probation in this case, this fee should be stricken.

31

G.   *Waltz Is Entitled to a Hearing on His Ability To Pay the Court Assessments and Restitution Fines Under* People v. Dueñas

Waltz contends the trial court violated his constitutional due process and equal protection rights by failing to determine whether he had the present ability to pay before imposing court assessments and restitution fines, citing this court's opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  In *Dueñas*, this court held due process "requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373," and it requires the trial court to stay execution of any restitution fine "unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Id.* at p. 1164.)

The People contend Waltz forfeited this argument because he failed to object at sentencing to the assessments and restitution fine.  However, at the time Waltz was sentenced in December 2018, *Dueñas* had not yet been decided.  As this court previously explained in rejecting this argument, "'[N]o California court prior to *Dueñas* had held it was unconstitutional to impose fines, fees or assessments without a determination of the defendant's ability to pay. . . .  When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture.' [Citations]." (*People v. Belloso* (2019) 42

32

Cal.App.5th 647, 662 (*Belloso*), review granted March 11, 2020, S259755, quoting *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 (*Castellano*).)  As in *Castellano* and *Belloso*, we decline to find Waltz forfeited his constitutional challenge to the imposition of the assessments and restitution fines.

Because Waltz was not aware of his ability to challenge the assessments and fines on due process and equal protection grounds, he should have that opportunity to do so on remand. (*Belloso, supra,* 42 Cal.App.5th at pp. 662-663.)  Accordingly, we remand for the trial court to allow Waltz to request a hearing and present evidence demonstrating his inability to pay the assessments and fines imposed by the trial court.

We reject the People's additional contention that any due process violation was harmless.  As this court explained in *Castellano* and *Belloso*, "the defendant need not present evidence of potential adverse consequences beyond the fee or assessment itself, as the imposition of a fine on a defendant unable to pay it is sufficient detriment to trigger due process protections." (*Castellano, supra,* 33 Cal.App.5th at p. 490; *Belloso, supra,* 42 Cal.App.5th at p. 663 [same].)

## DISPOSITION

The trial court's imposition of the $500 domestic violence fee is reversed, and the matter is remanded with instructions to strike the fee from the judgment and to allow Waltz to request an ability-to-pay hearing and present evidence demonstrating his inability to pay the assessments and fines the court imposes.  If Waltz demonstrates his inability to pay the assessments and fines, the trial court must strike them.  In all other respects, the judgment is affirmed.


RICHARDSON, J.*


We concur:


SEGAL, Acting P. J.


FEUER, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.